**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **SAMMY MARK GREEN and MIRIAM GREEN,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:25-cv-4 (MTT)** |
| **CITY OF PERRY, GEORGIA,** | ) | |
| **Defendant.** | ) | |

## ORDER

Defendant City of Perry, Georgia has moved for summary judgment and for sanctions against Plaintiffs Sammy Mark Green and Miriam Green and their former counsel, Kenneth Muhammad, pursuant to Federal Rule of Civil Procedure 11(c) and the Court's inherent authority. ECF 16; 17. The Court held a hearing on the motion for sanctions on March 19, 2026. ECF 33. For the following reasons, the City's motion for summary judgment (ECF 17) is **GRANTED,** and its motion for sanctions (ECF 16) is **GRANTED in part** and **DENIED in part.**

## I. BACKGROUND

### A. Summary Judgment[1]

This action is the latest in a series of lawsuits filed by the Greens or their company, MG Entities, LLC, related to a commercial property in Perry, Georgia ("the Property").

[1] Unless otherwise stated, these facts are undisputed and are viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). As discussed below, the Greens chose not to respond to the City's motion for summary judgment and thus did not file "a separate and concise statement of material facts" or a response to the City's statement of material facts as required by the Local Rules. *See* M.D. Ga. L. R. 56. Therefore, the City's statement of material fact is deemed to have been admitted by the Greens. *Id*. Still, the Court further confirmed that the facts were supported by the record by "review[ing] all of the evidentiary materials submitted in support of" the City's motion for summary judgment. *United States v. One Piece of Real Prop'y*, 363 F.3d 1099, 1101-02 (11th Cir. 2004).

ECF 17-2 ¶¶ 1, 2, 22, 58, 74. The Greens are the sole owners of MG Entities, LLC, which owned the Property from around 2013 to 2023. *Id.* ¶¶ 1, 2; ECF 17-30 at 7:25-8:3. During MG Entities' ownership, the Greens intended to operate an apartment building on the Property offering short-term rentals on a weekly or monthly basis. ECF 17-2 ¶ 3.

In December 2020, a fire took place at the Property. *Id.* ¶ 44. On February 3, 2022, the City filed a Complaint to Abate Public Nuisance in the Municipal Court of the City of Perry. *Id.* ¶ 45. The Municipal Court held a hearing on March 16, 2022, and entered an order finding "that the evidence presented by the City leads to a determination that the structure is unfit for human habitation or unfit for its use and not in compliance with applicable codes and constitutes an endangerment to public health and safety due to unsanitary or unsafe conditions." *Id.* ¶ 53; ECF 17-15 at 4. The Court ordered the building on the Property to be demolished after finding that "due to . . . the severe state of disrepair shown by the evidence, improvements cannot be made at a reasonable cost in relation to the present value of the building." ECF 17-2 ¶ 54; ECF 17-15 at 5. The Court also ordered "[t]he expenses of such demolition and removal of debris shall be charged against the real property in question, and the Court will issue an appropriate fi.fa. so that the City shall have a lien against the real property for the same." ECF 17-15 at 5. The Greens did not appeal this order. ECF 17-2 ¶ 55.

On March 31, 2022, MG Entities filed a Petition for Injunction and Temporary Restraining Order against the City in the Superior Court of Houston County. *Id.* ¶ 58; ECF 17-17. MG Entities alleged that demolishing the building on the Property would cause irreparable harm and sought a temporary restraining order to stop the demolition. ECF 17-2 ¶ 61; 17-17. The Court dismissed MG Entities' petition based on MG Entities' failure to appeal the March 16, 2022, Municipal Court's order and held a rule nisi hearing "for the

limited scope of reviewing whether due process procedures were followed in the nuisance abatement action in the Municipal Court." ECF 17-2 ¶¶ 68-71; 17-20 at 1-2. The Court determined all due process requirements were met. ECF 17-2 ¶ 72; 17-20 at 2. Around September 2022, the City demolished the buildings located on the Property. ECF 17-2 ¶ 56; 17-1 at 3, 40; 1 ¶ 19.

The Greens filed this action on January 6, 2025, alleging that the City violated their equal protection rights by "intentionally closing Plaintiffs' business repeatedly, demolishing Plaintiffs' Property, refusing to accept Plaintiffs' payment for the Property, and billing Plaintiffs based upon an intentionally false appraisal under color of state and local law because of their race." ECF 1 ¶ 25. MG Entities was not a party to the lawsuit at any time. The Greens sent no discovery requests to the City and took no depositions.

**B. Sanctions**

In their complaint, the Greens allege they "have suffered past and future damages totaling over Nine Million Dollars ($9,000,000)" (ECF 1 ¶ 1); "the Property generated approximately $25,000 per month in profits for Plaintiffs" (*id.* ¶ 7); and "[a]t no time from 2014 through 2023 . . . were there ever *any* eminent [sic] dangers or problems warranting closure of the Property" (*id.* ¶ 9). The Greens also alleged they possessed "true and accurate expert opinions establishing that the Property was structurally sound," and "an accurate appraisal demonstrating that the Defendant relied upon an intentionally false appraisal report." *Id.* ¶ 20.

In their initial disclosures, the Greens disclosed Samuel Stockton, Jr. and Ivory Mims as witnesses and identified categories of documents including "Report(s) and Exhibits from Samual Stockton, Jr." and "Financial documents from Ivory Mims." ECF 16-1 at 1-3. Their initial disclosures stated that Stockton inspected the Property and Mims

"[h]as information regarding income made from the subject property and lost income." *Id.* at 1-2. The initial disclosures also provided that "Plaintiffs anticipate relying upon evidence in the possession of Ivory Mims" to calculate their damages. *Id.* at 3. In their discovery responses, the Greens disclosed Stockton and Mims as expert witnesses and identified Stockton as one of the experts referenced in paragraph 20 of the complaint. *See* ECF 1 ¶ 20; 17-35 at 3-4. The Greens produced to the City one document bearing Stockton's name (the "Stockton document") and another bearing Mims' name (the "Mims document"). ECF 16-2; 16-3.

The first 11 paragraphs of the Stockton document contain what purports to be Stockton's opinion on the structural integrity of the Property. ECF 16-2 at 1. This portion of the document lists Stockton's name, address, and phone number, and is written in the first person, stating, "I am a licensed General Contractor in the State of Georgia and have been practicing in this capacity for 20 years . . . After my inspection, I can affirm that the overall structural integrity of the building is sound." *Id.* Similarly, the Mims document identifies Mims, provides his contact information, and is written and prepared to lead the reader to believe Mims prepared it. ECF 16-3. The Mims document purports to walk through various financial figures to calculate the Greens' total estimated income for the years 2020-2022. *Id.*

Stockton and Mims were deposed on December 2, 2025. ECF 17-33; 17-34. Both testified that they had never seen the documents bearing their names until their depositions, had not authored them, and did not hold the opinions attributed to them. ECF 17-33 at 46:16-21, 48:16-49:3, 53:3-13, 54:11-24, 61:10-14; 17-34 at 8:7-21, 10:3-18, 17:11-18:2, 22:25-23:16. Stockton testified that Mr. Green authored the Stockton document. ECF 17-33 at 47:25-48:2.

Counsel for the City served notice of its intended motion for sanctions on January 2, 2026, pursuant to Rule 11(c)(2)'s twenty-one-day safe harbor provision. In response, the Greens' former counsel, Kenneth Muhammad, served amended discovery responses withdrawing Stockton and Mims as experts, while reserving the right to call them as experts at trial, and offered to amend paragraph 20 of the complaint. ECF 29-14. Believing these measures insufficient to address the alleged Rule 11 violations, the City filed its sanctions motion on January 27, 2026. ECF 16.

At the March 19, 2026, hearing on the City's motion for sanctions, Muhammad initially represented that the Greens did not know who drafted the Stockton and Mims documents. After further probing from the Court and a recess during which Muhammad conferred with the Greens, Muhammad represented that Ms. Green drafted the Mims document.

## II. STANDARD

### A. Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* at 1438 (quoting *Celotex*, 477 U.S. at 324) (alterations in original). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249-50). Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### B. Sanctions

When an attorney files a motion or pleading, he or she certifies to the Court that, to the best of his or her "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,"

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and] (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

Fed. R. Civ. P. 11(b)(1)-(3). "The objective standard for testing conduct under Rule 11 is reasonableness under the circumstances and what was reasonable to believe at the time the pleading was submitted." *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998) (internal quotation marks and footnote omitted). Courts in this circuit employ a two-step inquiry: "(1) whether the party's claims are objectively frivolous; and (2) whether the person who signed the pleadings should have been aware that they were frivolous." *Id.* If there is a violation, the Court may impose sanctions. Fed. R. Civ. P. 11(c)(1). The purpose of Rule 11 sanctions is "to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4).

"Generally, if appropriate sanctions can be imposed under provisions such as Rule 11, courts should not exercise their inherent power. But if, in the informed decision of the court, neither the statute nor the Rules[2] are up to the task, the court may safely rely on its inherent power to sanction bad faith conduct in the course of litigation." *Peer v. Lewis*,

[2] The Court notes that the City did not move for sanctions pursuant to Federal Rule of Civil Procedure 26(g)(3). *See* ECF 17. Accordingly, whether the Greens' initial disclosures and discovery responses violated Rule 26(g) is not before the Court.

606 F.3d 1306, 1315 (11th Cir. 2010). “The key to unlocking a court’s inherent power is a finding of bad faith.” *Id.* at 1316 (citing *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998)).

## III. DISCUSSION

### A. Summary Judgment

The Greens allege that “[i]n February 2014, the City of Perry, through its building inspector, fire chief, city manager, and mayor began a decade long effort to prevent Plaintiffs from enjoying their ownership rights to MG Entities, LLC and the Property.” ECF 1 ¶ 8. Their one-count complaint charges that the City’s actions, “including intentionally closing Plaintiffs’ business repeatedly, demolishing Plaintiffs’ Property, refusing to accept Plaintiffs’ payment for the Property, and billing Plaintiffs’ based upon an intentionally false appraisal under color of state and local law because of their race, violated the Equal Protection Clause of the Fourteenth Amendment.” *Id.* ¶ 25. The City argues that it is entitled to summary judgment on five grounds.[3] ECF 17-1.

The summary judgment motion is not contested by the Greens’ former counsel or current counsel. Muhammad sought to voluntarily dismiss the action with prejudice rather than responding to the summary judgment motion.[4] ECF 26. Muhammad represented

[3] One of these grounds is Article III standing. ECF 17-1 at 33. The City argues that “no personal or direct injury to either Plaintiff has been alleged. Instead, all damages alleged arise from the Property, which was owned by MG Entities.” *Id.* at 34. The Court agrees that the Greens cannot recover the damages they seek for MG Entities’ business losses. However, the Greens assert a race-based equal protection claim, which they clearly have standing to bring.

[4] While Muhammad’s motion for leave to voluntarily dismiss the action did not specify whether the Greens sought dismissal with or without prejudice, Muhammad’s reply brief stated that “[a]t the time that the motion for leave was filed, it was intended that the dismissal would be with prejudice.” ECF 31 at 3; *see* ECF 26. This reply brief included an email from Ms. Green to Muhammad where she expressed: “we do not and did not consent to the dismissal of the [] case. When the possibility of dismissal was first mentioned, we communicated that we did not agree. We are reiterating again that.” ECF 31-1. The Court denied Muhammad’s motion for leave to voluntarily dismiss the case “because Plaintiffs' counsel does not have authority to dismiss the case.” ECF 32. This issue will be addressed further in the sanctions discussion.

that he learned that "one of the Plaintiffs was mistaken about the details surrounding the Plaintiffs' failure to pay the $185,000," and this discovery "changed the entire timeline of events, particularly as it involves the statute of limitations." *Id.* at 3. In his third motion for an extension of time to respond to the City's sanctions motion, Muhammad reiterated "new information disclosed by the Plaintiffs makes it clear that at least one issue warrants dismissal of the entire case." ECF 27 at 1. At the March 19, 2026, hearing, Muhammad admitted that the June 2023 allegation did not happen.

> Mr. Green related to me, um, an incident where the attempt is trying to be made to pay approximately $180,000 to keep the property. And the City responds with a statement that their machine is down and can't process the payment.
>
> . . .
>
> It was right around the time period when I filed that -- um, within a matter of a couple of days maybe, um, when it became clear that that situation never happened.
>
> . . .
>
> With [the failed payment allegation] not having happened -- not that it happened different, but it didn't happen at all -- with that not having happened at all, it became clear to me that even if there was something else out there, I didn't want to have anything to do with trying to make the statute of limitations [response].

To confirm Muhammad's representations to the Court were consistent with the record and the Greens' interests, the Court directed the Greens to retain new counsel and instructed new counsel to respond to the summary judgment motion. ECF 42. When new counsel entered the case, she confirmed "[t]he Plaintiffs do not plan on filing a Response to [the Defendant's] Motion for Summary Judgment." ECF 46 ¶ 3. The Greens' new counsel further stated, "[t]he undersigned has the authority to dismiss the above-styled case without prejudice, including a dismissal of the Motion for Sanctions." *Id.* ¶ 4. In sum,

the Greens and their former and current counsel did not contest the motion for summary judgment.

Normally, the mere failure to respond to a motion for summary judgment does not entitle the movant to summary judgment. *See United States v. One Piece of Real Prop*., 363 F.3d 1099, 1101-02 (11th Cir. 2004). Here, though, the Greens affirmatively chose not to respond and even offered to dismiss their complaint. That, the Court is convinced, is a concession that the motion is meritorious. Still, the Court has independently reviewed the record to determine whether the City has carried its burden under Federal Rule of Civil Procedure 56(c). It has.

The City argues that the Greens' equal protection claim, brought pursuant to 42 U.S.C. § 1983, is barred by the two-year statute of limitations. ECF 17. The Court agrees that the statute of limitations governing the Greens' equal protection claim is two years. *See Owens v. Okure,* 488 U.S. 235, 240-41 (1989) ("Because § 1983 claims are best characterized as personal injury actions, . . . a State's personal injury statute of limitations should be applied to all § 1983 claims.") (cleaned up); *Williams v. City of Atlanta*, 794 F.2d 624, 626 (11th Cir. 1986) ("the proper limitations period for all section 1983 claims in Georgia is the two year period outlined in O.C.G.A. § 9-3-33 for personal injuries."). The Greens filed suit on January 6, 2025, so any claim that accrued before January 6, 2023, is presumptively time-barred.

The only conduct the Greens allege occurred after January 6, 2023, is the June 2023 sale of the Property to a third party, alleged in the complaint as follows:

> Relying upon their intentionally false appraisal, Defendant filed a lien on the Property in the amount of $185,000 after the demolition.
>
> Relying upon the $185,000 bill, Defendant sold the Property to a third party in June 2023 and claimed that they could not accept Plaintiffs'

> attempt to pay the $185,000 before the sale because the city's payment machine was supposedly not working. Despite this, the Defendant accepted the payment from the third party buyer.

ECF 1 ¶¶ 21-22. First, to the extent the Greens assert the City's "rel[iance] upon [an] intentionally false appraisal" to calculate the $185,000 lien is a discrete harm, there is no associated date in the complaint or in the record.[5] Even if the alleged incident occurred after January 6, 2023, the record contains no evidence supporting this claim.

In the Municipal Court's March 16, 2022, Order on the City's Complaint to Abate Nuisance, the Municipal Court relied on an affidavit and appraisal report from Gary Stroup. ECF 17-15; 17-18 at 88-219. Based on Stroup's appraisal, the Court ordered demolition of the building on the Property after determining "the present value of the structure is zero dollars and has no value." ECF 17-15 at 5. The Greens never appealed that order, nor did they challenge Stroup's methodology or credentials in this action. In any event, nothing in the record supports finding that Stroup's appraisal, relied on by the Municipal Court to justify demolition, had any bearing on the calculation of actual costs incurred from the demolition or the $185,000 lien amount.

There is no evidence in the record of how the post-demolition lien amount was set, evidence of an "intentionally false appraisal," or evidence that race played any role in the post-demolition lien or sale of the Property. Mr. Green testified in his deposition as follows:

> Q. . . . [M]y point with [the March 2022 Order] is after reading this, don't you agree with me that at the time the city demolished this property there was a court order in place saying they could do that?

[5] The lien was a cost-recovery mechanism for the building's demolition expressly authorized by the Municipal Court's March 16, 2022, Order. *See* ECF 17-15 at 5 ("The expenses of such demolition and removal of debris shall be charged against the real property in question, and the Court will issue an appropriate fi.fa. so that the City shall have a lien against the real property for the same.").

> A. There was a court order in place saying that they could do that. And at that time I did ask the court would I be able to demolish my own building and they told me yes. Because I didn't want -- I didn't want to accumulate the charges that they were going to put on me. Because I knew for the last 10 years they wanted this building gone.
>
> So the first bid that they got on this building was $71,000. The next bid they got on this building was a hundred -- How did it go from $71,000 to $185,000. So you got to make that make sense to me.

ECF 17-30 at 48:20-49:8. This is the only reference to the $185,000 amount in the record. Critically, Muhammad admitted that that complaint's reference to "an accurate appraisal demonstrating that the Defendant relied upon an intentionally false appraisal" was based on the Stockton document and should be withdrawn. ECF 29-14; 1 ¶ 20; *see* ECF 16-2. As discussed in further detail in the Court's sanctions analysis, Muhammad admitted in response to the City's Rule 11 notice that Stockton did not author the document and accordingly, no "accurate appraisal demonstrating that the Defendant relied upon an intentionally false appraisal" exists. ECF 29-14. In sum, the record contains no evidence of any equal protection violation relating to the post-demolition $185,000 lien.

This leaves only the June 2023 sale of the Property to a third party and the City's alleged "refusal to accept full payment for [the] property [from the Plaintiffs] based upon a false claim that a payment machine does not work." ECF 1 ¶ 23. As recounted above, Muhammad represented in various filings and at the March 19, 2026, hearing that the June 2023 "refused payment incident" did not happen "at all." *See* ECF 26; 27 at 1. Regarding the attempted payment, Ms. Green testified in her deposition as follows:

> Q. You reference in your complaint that you tried to pay the $185,000 before the property was sold and the city could not accept it because their payment machine was not working; is that accurate?
>
> A. I'm thinking that was the process of it. We had an attorney -- Like I said, the investor at the time, which was Terri Madden, contacted Attorney Lauren. She contacted the city and they -- some kind of --

was supposed to take place to where the payment until we could get everything situated. But something happened where, I guess, the payment didn't go through or they didn't receive it. I'm not sure of that whole . . .

Q. Who was going to wire the money?

A. One of the investors.

Q. Do you know who?

A. I would have to get his -- It was coming through from one of the investors. Right now, I can just say Terri Madden because she was handling all that on that side with the financing.

Q. So you never actually talked to anybody with the city on this, did you? You and your husband?

A. I didn't talk to anybody from the city. I just talked to -- Nobody from the city.

Q. So who would be able to testify about this exchange about trying to pay it at the last -- at the date –

A. Ms. Terri Madden.

Q. Now, she's not previously been identified as a witness in this case. Can you tell me why?

A. I have -- I just -- I don't know. I just didn't think on it. My mind was so between the 2014 and, I guess, the fire. I just -- I mean, like I said, it's a lot and sometimes you just take a breather from it.

Q. So who actually called the city? Was that this attorney you're talking about Lauren?

A. Attorney Lauren Gilliam.

. . .

Q. Lauren Gilliam. So if she were called, she could testify about whether or not she called the city and tried to wire this money or not?

A. Yes.

Q. Do you know if that money had been deposited in her escrow account for her to wire before?

> A. I can't say.

ECF 17-29 at 110:4-112:1. In Mr. Green's deposition, he testified:

> Q. So last thing I want to talk about, your complaint references, and your wife talked about this a lot, but that you wanted to buy the property back. But someone on your behalf tried to wire money to the city the day before the sale but the payment machine was broken and the city wouldn't take it.
>
> A. Yeah, we were working on a deal up in Atlanta with some investors.
>
> . . .
>
> Q. Can you tell me who the investors were you were working with?
>
> A. They was out of Atlanta. Working with one of the people that my wife had connected with. I went up there and talked to the gentleman. When I went up there and talked to him, we were setting up to be able to allow him to come down here and I get the property back and get everything situated. Allow him to come down and do loft apartments. Do the retail store stuff because we right up the road from the ag center. So I knew the value of my property. I knew the property value was over $1 million. I knew that.
>
> But, you know, the whole time I had the property I had people coming trying to buy the property from me. So when me and this investor talked he said that we going to work it out because, we're going to use your land as collateral. That's when I find out that they selling my land on the courthouse steps.
>
> So when my wife go to get everything situated and we talk to an attorney up in Atlanta, she go to find out all the information and get everything situated to be able to get the property, pay for the property, she couldn't get through their automatic payment system or something. She called my wife saying hey, I don't know what's going on with their system, but something is going on.
>
> I think that was on a Friday. But then on that Monday she called us and said hey, they already sold your property and I'm trying to understand when did you start selling somebody's property with a lien on it? When do you do that? I don't understand that.
>
> Q. Do you know the names of any of the investors?

> A. I can get the guy's name. I can get his name. And I'll be glad to send it to you.

ECF 17-30 at 71:14-73:22.

The record is clear that the Greens themselves did not attempt to make payment to the City in June 2023. None of the individuals the Greens testified were involved in the attempt to purchase the Property were deposed, nor did they provide testimony by affidavit or otherwise. In sum, there is no evidence in the record of discriminatory treatment in the circumstances surrounding the June 2023 sale of the Property. Accordingly, no equal protection violation occurred within the statute of limitations.

Even if the Greens had evidence to support either non-time-barred theory—the use of a false appraisal to set the lien amount, or the Greens' attempt to purchase the property and the City's "false claim that a payment machine does not work"—they failed to identify a valid comparator. To state a claim under the Equal Protection Clause of the Fourteenth Amendment, plaintiffs must show that (1) they are "similarly situated" to individuals "who received more favorable treatment" and (2) "[their] discriminatory treatment was based on some constitutionally protected interest such as race." *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001) (cleaned up). The other similarly situated individuals—or comparators—must be alike in all material respects. *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1227 (11th Cir. 2019). "[A] valid comparison will turn not on formal labels, but rather on substantive likenesses." *Id.* at 1228. In other words, "a plaintiff and her comparators must be sufficiently similar, in an objective sense," such "that they cannot reasonably be distinguished." *Id.* (cleaned up).

The Greens allege the City "treated Plaintiffs differently than similarly situated White business owners by manufacturing pretenses to close Plaintiff's doors then strip

them of their business." ECF 1 ¶ 10; *see id.* ¶ 23. They initially responded to the City's interrogatory regarding similarly situated white business owners as follows:

> Every white business owner in the City of Perry is similarly situated who owns the land upon which their business is conducted, who earns income from said business. They were all treated differently because none of them had city officials intentionally prevent them from engaging in business using the tactics outlined in the Complaint. The names and addresses of said business owners will be obtained in discovery.

ECF 17-26. The Greens later supplemented their response after the Court ordered them to do so at the September 9, 2025, discovery conference:

> Paragraphs 10 and 23 of the Complaint were written specifically with Ronald Roy Rowland in mind. He is now deceased so Plaintiffs cannot provide contact information. Mr. Rowland owned the property at issue in this case immediately prior to the Plaintiffs. The property suffered fire damage during Mr. Rowland's ownership, years before the Plaintiffs became owners. Mr. Rowland conducted repairs and continued operating the business without interference. Immediately after the Plaintiffs purchased the building years later, the city began its harassment campaign which never stopped. The fire which occurred during Mr. Rowland's ownership of the property was the pretext used by the city to interfere with the Plaintiffs conducting business initially. This scheme never stopped throughout the entire time that they owned the property and they were never handled like Mr. Rowland. Mr. Rowland was similarly situated because he owned the exact same property, he conducted the exact same business, and he suffered damage while an owner then conducted repairs which is the exact same activity at issue. Similar individuals may be identified later after discovery has concluded.

ECF 11; 12.

At most, the record suggests that Rowland and the Greens might have been treated differently in interactions with the City concerning the Property around 2014. ECF 17-30 at 24:19-25:2; 17-29 at 84:14-22. Oddly, Muhammad attached Rowland's 2014 testimony in his response to the motion for sanctions. ECF 29-13 at 6-7. Counsel for the City stated at the March 19, 2026, hearing that the six exhibits attached to Muhammad's

response to the motion for sanctions were never provided in discovery. The Court has no obligation to review filings made in connection with a different motion for summary judgment purposes. Even if it did, the Greens' deposition testimony and Rowland's testimony from 2014 could not save the Greens' equal protection claim alleging race-based discrimination in 2023. Rowland's testimony addresses different regulations and government decisions from many years before the demolition lien and sale of the Property and cannot provide the necessary comparator evidence. Because no equal protection violation occurred within the statute of limitations and the Greens failed to identify a valid comparator, the City's motion for summary judgment (ECF 17) is **GRANTED**.

**B. Sanctions**

The City moves for sanctions pursuant to Federal Rule of Civil Procedure 11(c) and the Court's inherent authority. ECF 16. It seeks dismissal of the complaint with prejudice and attorney fees and expenses incurred in defending this action. *Id.* For the following reasons, the City's motion (ECF 16) is **GRANTED in part** and **DENIED in part.**

In his response to the motion for sanctions, Muhammad maintains that after the City served its Rule 11 safe harbor notice, he emailed the City's counsel to explain that Stockton and Mims are fact witnesses who may be used as non-retained experts and served an amended interrogatory response removing Stockton's and Mims' expert designations. ECF 29 at 8; 29-14. In the same email, he requested consent to amend paragraph 20 of the complaint to remove the allegation that the Plaintiffs "received an accurate appraisal demonstrating that the Defendant relied upon an intentionally false appraisal report." *Id.*; *see* ECF 1 ¶ 20. Muhammad thus argues that he withdrew all inaccurate information within the 21-day safe harbor period. *Id.* The City counters that

Muhammad's response was inadequate to remedy the alleged violations. The Court agrees with the City.

First, Muhammad's email request for the City's consent to withdraw one of the allegations in paragraph 20 did not correct the alleged violation for the simple reason that Muhammad's desired amendment was never effectuated. After seeking the City's consent to amend, Muhammad did nothing; he never filed a motion for leave to amend under Federal Rule of Civil Procedure 15(a)(2), and to this day, the offending allegation in paragraph 20 remains in the operative complaint. *See* ECF 1 ¶ 20. Moreover, Muhammad did not propose to withdraw the other allegation in paragraph 20 that "Plaintiffs have true and accurate expert opinions establishing that the Property was structurally sound," which the City charged was a false allegation based on the falsified Stockton document. *Id*.; *see* ECF 16 at 17; 29-14 at 1. Finally, in addition to paragraph 20, the City also alleged Rule 11 violations in paragraphs 1, 7, and 9 relating to damages and the allegation that "[a]t no time from 2014 through 2023 . . . were there ever *any* eminent [sic] dangers or problems warranting closure of the Property." ECF 1 ¶¶ 1, 7, 9. Muhammad's email response completely ignored these additional alleged violations rather than correcting them. Accordingly, the Court concludes that the City complied with Rule 11's safe harbor provisions and properly filed its motion for sanctions after Muhammad's response to the notice failed to address the alleged violations adequately.

The City seeks sanctions under Rule 11(c) because the complaint "presents false factual contentions unsupported by evidence and based on false and fictitious expert reports." ECF 16 at 1. Specifically, the City identifies four factual contentions in the complaint that it asserts lacked an evidentiary basis when made: (1) the allegation that "the Plaintiffs have suffered past and future damages totaling over Nine Million Dollars

($9,000,000)" (ECF 1 ¶ 1); (2) the allegation that "the Property generated approximately $25,000 per month in profits for Plaintiffs" (*id.* ¶ 7); (3) the allegation that "[a]t no time from 2014 through 2023 . . . were there ever *any* eminent [sic] dangers or problems warranting closure of the Property" (*id.* ¶ 9); (4) the allegation that the Plaintiffs possessed "an accurate appraisal demonstrating that the Defendant relied upon an intentionally false report." (*id.* ¶ 20).[6]

The Court notes that none of the offending factual allegations identified by the City have been withdrawn or corrected to date. The Greens' initial response to the motion for sanctions and supplemental responses fail to acknowledge the first three challenged allegations at all. ECF 29; 40; 48. The Court will briefly address them. The nine-million-dollar damages allegation (ECF 1 ¶ 1) clearly lacked an evidentiary basis when made. The only damages calculation the Greens disclosed during discovery was the Mims document, which, aside from not being authored or adopted by Mims, identified potential damages of $567,200. ECF 16-1 at 3; 16-3 at 2. The "$25,000 per month in profits" allegation (ECF 1 ¶ 7) was unsupported when made and contrary to the evidence and Ms. Green's testimony that the maximum income from the Property would be $15,000. ECF 17-29 at 68:3-69:11. Finally, the allegation that there were no "eminent dangers or problems warranting closure of the Property" between 2014 and 2023 (ECF 1 ¶ 9) was unsupported when made and contrary to the evidence that in 2022, the Municipal Court of the City of Perry found "the structure at issue is unfit for human habitation or unfit for its

[6] Since the City filed its motion for sanctions, as noted above, Muhammad has admitted that the allegation "Defendant sold the Property to a third party in June 2023 and claimed that they could not accept Plaintiffs' attempt to pay the $185,000 before the sale because the city's payment machine was supposedly not working" (ECF 1 ¶ 22) lacked evidentiary support when made. However, because the City did not provide notice of any deficiency in paragraph 22, the Court does not consider paragraph 22 in its Rule 11 sanctions analysis.

use and not in compliance with applicable codes and constitutes an endangerment to public health and safety due to unsanitary or unsafe conditions." ECF 16-4 at 4. Muhammad clearly did not reconcile the Greens' rental income and occupancy records or the 2022 Municipal Court order when pleading damages or characterizing the Property as free from imminent dangers between 2014 and 2023.

As noted, Muhammad admits that the allegation that the Plaintiffs possessed "an accurate appraisal demonstrating that the Defendant relied upon an intentionally false report" (ECF 1 ¶ 20) was false and unsupported by evidence when made. ECF 29-14. In his response to the motion for sanctions and testimony at the March 19, 2026, hearing, Muhammad asserted that he attempted to confirm this factual allegation had an evidentiary basis although he was ultimately wrong. ECF 29 at 9. The Court disagrees that Muhammad did anything close to a reasonable inquiry. He did not confirm that Stockton had authored or adopted the opinions attributed to him in the falsified Stockton document, which Muhammad admitted formed the basis for the allegation that the Plaintiffs possessed "an accurate appraisal demonstrating that the Defendant relied upon an intentionally false report." ECF 1 ¶ 20; 29-14 at 1 ("Prior to the filing of the Complaint, it was my belief that my clients told me that there was such an appraisal. I was willing to make the claim made in paragraph 20 having received the Samuel Stockton document - with the understanding that I would receive additional documentation at a later date."). Muhammad did not ask the Greens any questions about the documents they provided him.

The Court finds that Muhammad presented four factual contentions in the complaint which lacked evidentiary support when made. While plaintiffs themselves may be sanctioned pursuant to Rule 11 for "misrepresent[ing] facts in the pleadings," this is not

a case where the Greens were “the mastermind[s]” behind the offending allegations. *See Byrne v. Nezhat,* 261 F.3d 1075, 1117-18 (11th Cir. 2001). Muhammad was responsible for conducting a reasonable inquiry into the Stockton document forming the basis for the “intentionally false appraisal” allegation. *See* ECF 1 ¶ 20. Although the Greens provided the Stockton document to Muhammad before the case was filed, Muhammad never followed up with the Greens or Mr. Stockton to confirm the opinions contained in the document before relying on it in drafting the complaint. He likewise did not conduct a reasonable inquiry to confirm the damages or “eminent danger” allegations had factual support. The record reflects that Muhammad inquired into the circumstances surrounding the Stockton and Mims documents only *after* the City’s summary judgment motion and motion for sanctions were filed. Pursuant to Rule 11(c), Muhammad shall be sanctioned in an amount representing the reasonable attorney fees and expenses the City incurred as a direct result of the Rule 11(b)(3) violations. The Court will not impose Rule 11 sanctions on the Greens.

The City seeks additional sanctions under the Court’s inherent authority because “the Plaintiffs submitted fraudulent and falsified expert reports, identified witnesses as experts who were not in fact experts and had no relevant opinion on the matters of the case.” ECF 16 at 1. The Court agrees with the City that the record conclusively establishes that the Greens, through Muhammad, provided a document authored by Ms. Green to Muhammad, and Muhammad disclosed it to the City as the expert report of Ivory Mims, who had never seen the document before his deposition and expressly disclaimed the opinions therein. ECF 16-1; 17-34 at 8:7-21, 9:24-10:14:22. The record also conclusively establishes that the Greens provided a document to Muhammad that Muhammad disclosed as the expert report of Samuel Stockton, who had never seen the

document before his deposition and testified that Mr. Green drafted the document. ECF 16-1; 17-33 at 47:25-48:2. Nonetheless, the Court declines to sanction Muhammad or the Greens pursuant to its inherent authority because the record does not conclusively establish subjective bad faith, and appropriate sanctions addressing the factual allegations lacking evidentiary support will be imposed under Rule 11.[7]

At the March 19, 2026, hearing, the Court directed Muhammad's attention to the alleged false reports, specifically the City's allegation that "somebody committed a fraud on the Court." Muhammad testified that he received the Stockton and Mims documents from Ms. Green months before filing the complaint and believed they were reports authored by Stockton and Mims. However, Muhammad also testified that he "received [] documents in bulk" and did not discuss the contents of the documents with the Greens or Mims or Stockton themselves before filing the complaint or at any time before Stockton and Mims were deposed. Muhammad explained that he spoke with Mims and Stockton by telephone before the complaint was filed and "didn't use the documents in the conversation." Accordingly, Muhammad blindly relied on the documents in drafting the complaint and presented them as expert reports without verifying any details about their authorship or content. Muhammad's conduct was reckless to the extreme, and there is no doubt his failure to communicate with his witnesses and clients caused many of the problems before the Court today, including the Rule 11 violations recounted above.[8] But the record as it stands does not support a finding that Muhammad intended to deceive the

---

[7] It appears to the Court that the Greens' initial disclosures and discovery responses related to Stockton and Mims would fall squarely under Rule 26(g). As noted, the City did not move for Rule 26(g) sanctions. *See* ECF 17.

[8] Muhammad's failure to effectively communicate with his clients likely also led to him filing a motion for leave to voluntarily dismiss the case without the Greens' permission. *See* ECF 26; 31.

City or the Court; rather, he believed, without any confirmation, that the documents were what they appeared to be when he held them out as expert reports. Accordingly, the Court does not find that Muhammad acted with subjective bad faith.

The same is true of the Greens. While Ms. Green admitted to drafting the Mims document, she swore under oath that she "did not prepare [the document] with the intention that it would be represented as a completed report authored by Mr. Mims." ECF 48-1 ¶ 7. As to the Stockton document, Mr. Green swore under oath that he "knew that Mr. Stockton had not written the document himself, had not signed it, and had not reviewed and adopted the entire document as his expert report." ECF 48-2 ¶ 6-8. He also swore that he understood at the time he provided the document to Muhammad that "the document was a draft that would require further review and discussion before it could be finalized or attributed to Mr. Stockton." *Id.* ¶ 10. The Court notes that the Greens' initial reluctance to reveal that Ms. Green drafted the Mims documents at the March 19, 2026, hearing, and their failure ever to identify the author of the Stockton document, diminish the overall credibility of their narrative. As noted above, Stockton identified Mr. Green as the author of the report, and Muhammad represented in response to the Rule 11 sanctions notice that "[his] client drafted the document bearing the name of Samuel Stockton and the document contains what my client believed both parties agreed was true." ECF 17-33 at 47:25-48:2; 29-14. Nonetheless, the Court finds the Greens' sworn statements about being kept in the dark by Muhammad credible and uncontroverted.

In their declarations, the Greens testified that when they provided the Mims and Stockton documents to Muhammad months before the lawsuit was filed, he told them the "draft documents were for him and that he would arrange meetings involving us, Mr. Mims, and Mr. Stockton so that the information could be reviewed with the individuals

involved." ECF 48-1 ¶¶ 6, 7, 11; 48-2 ¶¶ 8-12. However, those meetings never occurred, and the Greens learned that Muhammad produced the documents to the City and held them out as expert reports only after Mims' and Stockton's respective depositions, when Mims and Stockton reached out to the Greens personally to ask about the documents. ECF 48-1 ¶¶ 12, 13, 21, 22; 48-2 ¶¶ 13-22. Muhammad did not discuss the documents with Ms. Green until January 22, 2026, nearly two months after Mims' and Stockton's depositions and when the Rule 11 safe harbor was already running. ECF 48-1 ¶¶ 23-27. The uncontroverted record establishes that the Greens did not direct or authorize Muhammad to present the documents as expert reports and were not aware that Muhammad did so until Stockton's and Mims' depositions. Accordingly, the Court does not find the Greens acted with subjective bad faith.

In sum, because the record does not conclusively establish subjective bad faith on the part of Muhammad or the Greens, the Court declines to sanction Muhammad or the Greens pursuant to its inherent authority.

## IV. CONCLUSION

For the reasons discussed above, the City's motion for summary judgment (ECF 17) is **GRANTED,** and its motion for sanctions (ECF 16) is **GRANTED in part** and **DENIED in part.** Pursuant to Rule 11(c), Muhammad shall be sanctioned in an amount representing the reasonable attorney fees and expenses the City incurred as a direct result of the Rule 11(b)(3) violations. Counsel for the City shall submit a sworn statement attesting to those fees and expenses by **October 2, 2026,** and Muhammad shall have 21 days to respond.[9]

[9] This is not a blank check. The City's request must be carefully tailored to the Rule 11 violations.

**SO ORDERED**, this 2nd day of September, 2026.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT